### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF TEXAS
### CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| **YOLANDA RAMIREZ and** | § | |
| **MICHELLE RAMIREZ-WOOTEN,** | § | |
|    **Plaintiffs** | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO. C-05-135** |
| | § | |
| **THE CITY OF ROBSTOWN and** | § | |
| **DAVID LOPEZ,** | § | |
|      **Defendants** | § | |

### <u>MEMORANDUM AND RECOMMENDATION</u>

Plaintiffs Yolanda Ramirez ("Ramirez") and Michelle Ramirez-Wooten ("Wooten") filed this lawsuit against their former employer, the City of Robstown ("the City"), and one of their former co-workers, David Lopez ("Lopez"), alleging a number of causes of action related to their employment.  Both plaintiffs, who are mother and daughter as well as co-workers, allege that defendant subjected them to a sexually hostile environment and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., and Chapter 21 of the Texas Labor Code.  In addition, plaintiff Wooten alleges an assault and/or battery claim and an intentional infliction of emotional distress claim against defendant Lopez[1].  Defendant filed a motion for partial summary judgment on January 23, 2006 to which plaintiffs responded on February 13, 2006 (D.E. 23, 24).

### <u>JURISDICTION</u>

This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

---

[1]In their original complaint, plaintiffs alleged negligence, gross negligence and assault and battery claims against the City of Robstown, but indicated in their response to the motion for partial summary judgment that they are abandoning those claims (D.E. 24, p. 2, n. 1).

## BACKGROUND

**A.  Factual Allegations**

**(1) Wooten**

Plaintiff Wooten began working for the City of Robstown Emergency Medical Services ("EMS") department on June 26, 2003 after having recently completed a training program.  She was employed as a "Basic" Emergency Medical Technician, ("EMT") and was always assigned to work with a more qualified and experienced paramedic (Aff. of Michelle Ramirez-Wooten, D.E. 24, Ex. A, ¶ 2).  She joined her mother, plaintiff Ramirez, who started working at Robstown EMS on June 4, 2003, also having recently completed EMS training (Aff. of Yolanda Ramirez, D.E. 24, Ex. B, ¶ 3).

While on duty, EMS employees usually spent the night at work.  There were two stations where employees slept--the Main Station and the Substation.  The Main Station had offices and a computer and a number of employees were usually present.  The Substation was smaller and less busy and was located in a rundown housing project.  It was common to be at the Substation for hours with only a partner and the television set (Wooten Aff., D.E. 24, Ex. A, ¶ 4).

Wooten got along with almost everyone in the EMS department and thought of most of her co-workers as friends.  There were few women in the department and soon after she started work, she noticed that many of the men used sexually explicit language and engaged in behavior with sexual overtones.  The men would wrestle with one another, grabbing and pinching one another's private parts and laughing about it.  They called each other "fags," discussed women's body parts, talked about sexual exploits, called women "sluts" and "whores" and used graphic

2

language to describe body parts (Wooten Aff., D.E. 24, Ex. A, ¶ 5; Ramirez Aff., D.E. 24, Ex. B, ¶ 7).

Defendant Lopez was one of plaintiffs' co-workers who engaged in sexually explicit talk and actions.   At first, Wooten enjoyed working with Lopez, an experienced paramedic, because she thought she could learn a lot about the job from him.   She also considered him a friend, and felt sorry for him because his wife had advanced cervical cancer and he had two young sons (Wooten Aff., D.E. 24, Ex. A, ¶ 6).

As time went on, Lopez began to tell Wooten that he could not have sex with his wife and said he wanted to have sex with someone.  He started asking her to have sex with him, but Wooten, who wed in August 2003, always said "no."  Lopez told Wooten about other women with whom he had had sex, including one of their co-workers, and it made her uncomfortable and embarrassed (Wooten Aff., D.E. 24, Ex. A, ¶¶ 2, 7).

Lopez began to touch Wooten in unwelcome ways.  Once, in front of the shift crew, while Wooten was bending over to get something, Lopez walked behind her and thrust his penis area onto her buttocks.  She pushed him away and told him to leave her alone and he laughed and walked away.  He repeated this behavior on four different occasions.  In addition, he brushed or slapped Wooten's buttocks on occasion and repeatedly asked her to have sex with him (Wooten Aff., D.E. 24, Ex. A, ¶¶ 8, 9).

Wooten did not want to report his behavior because she was afraid she would lose her job.  In addition, her supervisor, EMS director Adan Blanco ("Blanco"), was aware of and participated in the sexually charged language.  Although Lopez often touched Wooten inappropriately in plain view of everyone else on the shift, no supervisor ever told him to stop.

3

EMS employees who saw Lopez engage in inappropriate sexual behavior include shift supervisors Bert Lopez, Mark Mirelez, Rodney Crawford, Kevin Ramon and director Blanco (D.E. 24, Ex. A, ¶¶ 10, 11).

On October 21, 2003 Wooten was working with Lopez and Heather Wright ("Wright") at the Substation. Wright was in a room with only one bed and her boyfriend was visiting that evening. Wooten and Lopez were in another room with two twin-size beds. Wooten went to sleep and was awakened by Lopez grabbing her breast. He then grabbed her right hand and placed it inside his pants with the back side of her hand touching his penis. She pushed him off the bed and asked him what he was doing and he jumped back on top of her while she was sitting up on the bed. He covered her mouth, pinned her shoulders to the bed, undid her belt and zipper and raped her. At one point she was able to grab the right side of her neck with his left hand, but he became very forceful and pinned her shoulder tightly to the bed (Wooten Aff., D.E. 24, Ex. A, ¶¶ 12, 13).

When he was finished, Lopez apologized and said he could not believe what he had just done. Plaintiff got up off the bed and went into the bathroom where she stripped down and washed her body in the sink. She next went into the kitchen and sat at the table. She heard Wright talking on the telephone in her room. Plaintiff returned to the bedroom and lay on her bed. Lopez was lying on his bed facing the wall (Wooten Aff., D.E. 24, Ex. A, ¶ 14).

That night they had two calls and Wooten performed her duties as if on "auto-pilot." When her shift was over, she went home. She was shocked and embarrassed and tried to forget what happened. She was afraid to tell her husband about the incident because she knew he would be angry (Wooten Aff., D.E. 24, Ex. A, ¶¶ 15-17).

4

On October 25, 2003, Wooten told shift supervisor Mark Mirelez ("Mirelez") what had happened, although she did not go into explicit detail.  Mirelez advised her to tell Blanco.  She asked Mirelez not to discuss the incident with anyone (Wooten Aff., D.E. 24, Ex. A, ¶ 18)

On October 26, 2003 Wooten told her mother, Ramirez, about the incident.  Wooten also told her husband, although she did not tell him all the details.  Both Ramirez and Wooten's husband encouraged her to report the incident.  Ramirez also told Wooten that Lopez had recently jumped on her while she was lying down and she told him to get off (Wooten Aff., D.E. 24, Ex. A, ¶ 19).

On November 1, 2003 Wooten heard from another EMS employee that Lopez had asked the employee if he was planning on having sex with Wooten and indicated that he (Lopez) was planning to try to "hit it" with her again (Wooten Aff., D.E. 24, Ex. A, ¶ 20).  Wooten approached another shift supervisor, Bert Lopez, and told him about the incident, although she stopped short of telling him all of the details.  Bert Lopez called EMS director Blanco and told him about Wooten's allegations.  Blanco told Wooten (via Lopez) to write down her allegations.  She did so, although she did not provide all of the explicit details.  On November 2, 2003 Wooten provided the written statement to Blanco (Wooten Aff., D.E. 24, Ex. A, ¶¶. 21-24; D.E. 23, Ex. 1-F).

On November 3, 2003 Blanco told Wooten to call Paula Wakefield ("Wakefield"), the City Secretary, about her complaint.  Wooten and Wakefield met on November 4, 2003 and Wooten explained the incident in detail and told Wakefield that Lopez had said he was going to try and "hit it" with Wooten again.  Wooten also described Lopez's other aggressive behavior.

Wakefield was concerned about Wooten's husband's reaction. Wakefield also told Wooten to discuss the situation with Blanco (Wooten Aff., D.E. 24, Ex. A, ¶¶ 26-27).

When Wooten discussed the incident and Lopez's other inappropriate behavior with Blanco, he asked her if she was sure that Lopez was not joking. Blanco also told Wooten that she was a liability to the City of Robstown because she reported the incident and had told her co-workers what had happened. He also told her that another female employee had filed a similar complaint and could not find a job for 300 miles because she had reported an incident. In addition, Blanco told plaintiff that she would be fired if she told anyone else about the incident and that if he heard anyone else talking about it, he or she would be terminated as well (Wooten Aff., D.E. 24, Ex. A, ¶¶ 28-29).

On November 7, 2003 Blanco called Wooten into the office and showed her a document stating that after an investigation of the incident, Lopez was to be suspended for two days and Wooten was being reprimanded. In addition, Lopez was not going to be assigned to the Substation and she and Lopez would not be assigned to work together. Lopez had signed the document and Blanco asked Wooten to sign it. She refused and asked why she was being reprimanded. Blanco told her that if she had not told everyone what had happened, Lopez would have been terminated, but because she had told people about the incident, she was being punished by having Lopez stay on the job (Wooten Aff., D.E. 24, Ex. A, ¶ 30).

Plaintiff went to Wakefield's office and complained about Blanco's investigation and proposed discipline. She told Wakefield that she was going to resign because she no longer felt safe working for Robstown EMS. Wakefield did not encourage Wooten to stay, but offered to

6

write a letter of resignation for her and then proceeded to do so at her computer as she read it out loud.  Wooten signed the letter of resignation and left (Wooten Aff., D.E. 24, Ex. A, ¶ 31).

### (2) Ramirez

Plaintiff Ramirez began working for Robstown EMS on June 4, 2003 as a "Basic," after recently having completed EMS training and was looking forward to a new career (Ramirez Aff., D.E. 24, Ex. B, ¶¶ 1, 3, 4).  A few weeks after starting work, Ramirez began noticing the sexually explicit talk and actions between the mostly male employees (Ramirez Aff., D.E. 24, Ex. B, ¶ 7).  Defendant Lopez told Ramirez that he could not have sex with his wife and that he wanted to "hit it hard" with somebody.  He also bragged about having sex with other women. The talk made Ramirez uncomfortable (Ramirez Aff., D.E. 24, Ex. B, ¶¶ 8, 9).

Lopez told Ramirez and other female employees, in the presence of supervisors, not to bend over if they did not want him to slap their buttocks.  One afternoon Ramirez was watching television and talking on the telephone when Lopez approached the bed she was sitting on and threw himself on top of her.  She yelled at him to get off and the supervisor on duty and a co-worker ran into the room.  The supervisor told Lopez to get off of Ramirez and added, "She's my woman."  Ramirez tried to push Lopez off of her but he was too heavy.  After a few minutes he got off and went into another room (Ramirez Aff., D.E. 24, Ex. B, ¶¶ 10, 11).

On several occasions, Lopez tried to grab Ramirez and hug her and he would come up behind her, wrap his arms around her and pull her back against his body.  Lopez sometimes did this in front of EMS director Blanco.  In addition, Lopez slapped Ramirez's buttocks and made sexual comments in front of Blanco, who laughed.  Ramirez always pushed Lopez away and told

him to stop touching her.  She complained about his behavior in front of Blanco and other supervisors (Ramirez Aff., D.E. 24, Ex. B, ¶ 12).

One morning when Lopez and Ramirez were sharing sleeping quarters, Lopez said to Ramirez, "I have a little problem here.  Can you help me?"  He was referring to his groin area and implied that he had an erection.  Ramirez rebuffed him.  On another occasion he asked her to sleep with him and she refused.  Another time, Ramirez overheard a telephone conversation in which Lopez was encouraging a co-worker to force himself on another female co-worker (Ramirez Aff., D.E. 24, Ex. B, ¶¶ 13-14).

After Wooten was sexually assaulted and the EMS department did not do anything about it, Ramirez began to complain to Blanco about how he had handled the situation.  She was subsequently removed from the Main Station and thereafter assigned most often to the Substation.  No one talked to her and she never received an evaluation.  Ramirez felt isolated and because no one was talking to her, she did not think she was getting the on-the-job training that she needed.  She also felt uncomfortable running into Lopez and was afraid of how he reacted to her.  Ramirez believed she had no choice but to resign.  After she told a co-worker that she thought she was being treated unfairly, he told her that he had relayed her concerns to Blanco, who suggested she go to City Hall and resign (Ramirez Aff., D.E. 24, Ex. B, ¶¶ 15-17).  Ramirez resigned in February 2004 (Compl., D.E. 1, p. 5).

Both plaintiffs allege that the City of Robstown subjected them to a sexually hostile environment and retaliation in the form of constructive discharge in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and Chapter 21 of the Texas Labor Code.  In

addition, plaintiff Wooten alleges an assault and/or battery claim and an intentional infliction of emotional distress claim against defendant Lopez.

Both plaintiffs filed EEOC charges and received their notices of "Right to Sue" on December 17, 2004.  Defendant does not contest that plaintiffs exhausted their administrative remedies (D.E. 23, Ex. 3).

In its motion for partial summary judgment, the City argues that Wooten cannot establish a hostile environment claim because there is no evidence the City knew or should have known of the harassment and failed to take prompt remedial action.  In addition, the City argues that Wooten cannot make out a retaliation claim because there is no evidence that she was reprimanded and that even if she were reprimanded, a reprimand is not an ultimate employment decision.  Finally, the City argues that Wooten cannot show that she was constructively discharged because the City took prompt, remedial action when it received her complaint.

The City argues that Ramirez cannot establish a hostile environment claim because she cannot show that any harassment to which she may have been subjected affected a term, condition or privilege of her employment and she cannot show that the City knew or should have known of the harassment and failed to take prompt remedial action.  In addition, the City argues that Ramirez cannot establish a retaliation claim because none of the actions about which Ramirez complains constituted ultimate employment decisions and also because she was not denied a pay raise or the chance to work overtime.  The City further argues that Ramirez cannot establish that she was constructively discharged because she has not alleged any aggravating factors in addition to her claims of hostile environment discrimination.

Defendants did not move for summary judgment on the assault and battery and intentional infliction of emotional distress claims against defendant Lopez.

## **APPLICABLE LAW**

### A.  Summary Judgment Standard

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  See FED.R.CIV.P. 56(c).  An issue is material if its resolution could affect the outcome of the action.  Daniels v. City of Arlington, 246 F.3d 500, 502 (5th Cir.), cert. denied, 122 S. Ct. 347 (2001).  The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).  In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file, drawing all justifiable inferences in favor of the party opposing the motions.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).  The Court will not weigh the evidence or evaluate the credibility of witnesses.  Caboni v. General Motors Corp., 278 F.3d 448, 451 (5th Cir. 2002).

The movant bears the initial burden of showing the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).  If the movant demonstrates there is an absence of evidence to support the nonmovant's case, the nonmovant must come forward with specific facts showing that there is a genuine issue for trial.  See Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356.  To sustain this burden, the

nonmovant cannot rest on the mere allegations of the pleadings.  See Celotex, 477 U.S. at 324, 106 S. Ct. at 2553; Caboni, 278 F.3d at 451; FED.R.CIV.P. 56(e).  After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted.  Caboni, 278 F.3d at 451.

**B.  Title VII Hostile Environment Sexual Harassment**

Under Title VII, it is unlawful for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, national origin or age.  42 U.S.C.A. § 2000e-2.  Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute a form of sex discrimination known as "hostile environment" or "abusive environment" sexual harassment under the statute.  Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 2399 (1986)(citing 29 C.F.R. § 1604.11(a)).

To state a claim for hostile environment sexual harassment, one must show (1) that she belongs to a protected group; (2) was subject to unwelcome sexual harassment; (3) the harassment was based upon sex; (4) the harassment affected a term, condition, or privilege of employment and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action.  Woods v. Delta Beverage Group, Inc., 274 F.3d 295, 298 (5th Cir. 2001)(citing Shepherd v. Comptroller of Public Accounts of the State of Texas, 168 F.3d 871, 873 (5th Cir. 1999)).

The harassment must be sufficiently severe to alter the conditions of the complainant's employment and create an abusive working environment.  Meritor Sav. Bank, FSB v. Vinson,

477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 295 (1986); Walker v. Thompson, 214 F.3d 615, 625 (5th Cir. 2000).  In order to prevail on a claim of hostile environment sexual harassment, a complainant need not show that the conduct seriously affected her well-being or led her to suffer injury, but that the environment would reasonably be perceived and is perceived as hostile or abusive.  Harris v. Forklift Systems, Inc., 510 U.S. 17, 22, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993)(citing Meritor, 47 U.S. at 67, 106 S.Ct. at 2405).  In order to determine whether an environment is hostile or abusive, a court must look at the frequency of the conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.  Harris, 510 U.S. at 23, 14 S.Ct. at 371.  In the Fifth Circuit, discriminatory verbal intimidation, ridicule and nasty insults may be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.  Walker, 214 F.3d at 626 (citing Wallace v. Texas Tech University, 80 F.3d 1042, 1049, n. 9 (5th Cir. 1996)).  However, the mere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII.  Harris, 510 U.S. at 21, 114 S.Ct. at 370.

In the Fifth Circuit, co-worker harassment cases are treated slightly differently from supervisor harassment cases in terms of employer liability.  In a supervisor harassment case, after the employee has stated a cause of action for supervisor harassment, an employer can assert an affirmative defense showing that it exercised reasonable care to prevent and correct promptly any behavior and that the employee reasonably failed to take advantage of any preventative or corrective opportunities provided by the employer to avoid harm otherwise.  See Burlington Industries v. Ellerth, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).  In a co-worker

12

case, the initial burden is on the employee to show that the employer knew or should have known of the harassment and failed to take prompt remedial action.  <u>Woods</u>, 274 F.3d at 298-299; <u>Watts v. Kroger</u>, 170 F.3d 505, 509 (5th Cir. 1999).

**(1) Wooten**

Defendant argues that Wooten cannot establish a hostile work environment claim because there is no evidence that the City knew or should have known of the harassment and failed to take prompt remedial action.  The City argues that after hearing Wooten's allegations, it took prompt remedial action by conducting an investigation which revealed no information or evidence to corroborate her allegations.  Nevertheless, Wakefield determined that to avoid conflict, Lopez and Wooten would not be assigned to work on the same day (Wakefield Aff., D.E. 23, Ex. 1, p. 4).

"Whether an employer's response to discriminatory conduct is sufficient 'will necessarily depend on the particular facts of the case--the severity and persistence of the harassment, and the effectiveness of any initial remedial steps.'" <u>Hirras v. National Railroad Passenger Corporation</u>, 95 F.3d 396, 399-400 (5th Cir. 1996)(citing <u>Waltman v. International Paper Co.</u>, 875 F.2d 468, 479 (5th Cir. 1989)).  An employer may be found to take prompt remedial action when it takes the allegation seriously, conducts a prompt and thorough investigation and immediately implements remedial measures based on the result of the investigation.  <u>Waymire v. Harris County, Texas</u>, 86 F.3d 424, 428 (5th Cir. 1996)(citing <u>Carmen v. Lubrizol Corp.</u>, 17 F.3d 791, 795 (5th Cir. 1994)).

As an initial matter, the evidence submitted by defendant in support of its claim that it conducted an investigation is hearsay and inadequate to support a motion for summary judgment.

The City submitted an affidavit by Wakefield, who stated that Blanco told her he conducted an investigation (Wakefield Aff., D.E. 23, Ex. 1, p. 4).  "Evidence on summary judgment may be considered to the extent not based on hearsay or other information at trial."  Fowler v. Smith, 68 F.3d 124, 126 (5th Cir. 1995).

Nevertheless, plaintiffs submitted excerpts of Blanco's deposition testimony in which he claims to have conducted an investigation, but which actually raise questions about whether he conducted an investigation or merely went through the motions.  For example, Blanco testified that he did not talk to Wooten about her allegations, other than to ask her if everything in her written statement was correct.  "Me and Michelle never talked about this incident, never." (Deposition of Adan Blanco, D.E. 24, Ex. C, p. 70).  "It's like maybe like five minutes maybe.  I don't think it was that long."  (Id.).

Also, Blanco testified that he and Wakefield determined that on the date Wooten said she was assaulted, neither she nor Lopez were scheduled to work (Blanco Depo., D.E. 24, Ex. C, pp. 72-73).  No further effort was made to determine whether Wooten had been mistaken about the date or whether the discrepancy could be explained any other way.  Rather, Blanco and Wakefield determined that whatever had happened, Wooten and Lopez were on their own time and the City could not take any action (Blanco Depo, D.E. 24, Ex. C, pp. 76-77; Letter, D.E. 23, Ex. 1-G ).  Such a conclusion was ridiculous in light of the fact that Wooten stated in her complaint that the assault occurred at the Substation during work hours.  At the very least, the inconsistency called for a more detailed investigation.

In addition, fact questions exist on whether the assurance that Lopez and Wooten would never be assigned to work the same shift could be considered a remedial action.  Wakefield

stated in her affidavit that employees changed shifts as required by the City or their own scheduling needs (Wakefield Aff., D.E. 23, Ex. 1, p. 2). Nothing about the purported remedial action guaranteed that Wooten would never have to work with Lopez again. Moreover, Wooten stated that before the City issued the notice that it would not schedule Wooten and Lopez on the same days, Blanco told her that she was going to be reprimanded for reporting the incident and implied that she would not be employable in the area because of her report.

Were a jury to believe Wooten's version of events, it would find that she alleged being raped at work--arguably the most serious sexual harassment claim an employee can make--and the City at best conducted a limited, cursory investigation and offered a tepid solution to her concerns about sexual harassment. The jury might also find that defendant threatened plaintiff for reporting the incident. Neither response could not be considered a prompt, remedial action[2]. Accordingly, summary judgment is not appropriate on Wooten's hostile environment claim.

**(2) Ramirez**

Defendant does not dispute that Lopez engaged in the conduct Ramirez described, but argues that plaintiff cannot make out a prima facie case of sexual harassment because her allegations do not describe conduct that is severe or pervasive enough to create a hostile work environment. However, the incidents Ramirez describes go beyond the utterance of an epithet or behavior that might engender offensive feelings and are like those found in situations where the Fifth Circuit has determined that an employee was subjected to a hostile environment.

---

[2]For examples where the Fifth Circuit has found that employers conducted thorough investigations and took prompt, remedial actions, see Hirras, 95 F.3d at 398-399 and Waymire, 86 F.3d at 428.

15

For example, in Meritor, over a four-year period the plaintiff felt obligated to have sex with her supervisor out of fear of losing her job and the supervisor made repeated sexual demands on her, fondled her in front of other employees, followed her into the women's restroom, exposed himself to her and forcibly raped her on several occasions.

In Harris, over a 19-month period, the supervisor made comments to the plaintiff like "You're a woman, what do you know?"and "We need a man as the rental manager." He also called her "dumb ass woman."  In front of other employees, the manager suggested that he and plaintiff go to a motel to negotiate her raise and occasionally asked plaintiff and other female employees to get coins out of his front pants pocket.  He threw objects on the ground and asked female employees to pick them up and made sexual innuendo about their clothes.  In front of other employees, the manager asked the plaintiff if she had promised a customer sex as part of a deal she had negotiated.

In Waltman, an employee broadcast obscenities directed at the plaintiff over the public address system and other employees made suggestive comments to the plaintiff.  Her supervisor urged her to have sex with a co-worker, pinched her buttocks with pliers and tried to put his hands in her back pockets.  He and other employees made comments like "I would like to get a piece of that," referring to plaintiff.  Plaintiff received pornographic material in her locker and sexually explicit pictures and graffiti were drawn throughout the workplace, some of which were directed to plaintiff.  In addition, the plaintiff was subjected to several threats of violence for reporting the incidents.

Although Ramirez does not allege that Lopez raped her, she does allege that he repeatedly asked her to have sex, slapped her buttocks in front of other employees, hugged her

16

although she made it clear that she did not want him to touch her and indicated to her that he had an erection.  In addition, she alleges that he jumped on her while she was on the bed and she was unable to push him off.

Looking at the evidence in the light most favorable to Ramirez, it appears that she has made out a prima facie hostile environment sexual harassment claim.  She has described behavior that was physically threatening and humiliating and that could reasonably be expected to interfere with her work performance.  Harris, 510 U.S. at 23, 14 S.Ct. at 371.  Although Ramirez asked Lopez to stop the behavior he ignored her and continued to touch her inappropriately.  Accordingly, Ramirez has presented evidence to support a prima facie case of hostile environment sexual harassment.

Defendant also argues that there is no evidence that the City knew or should have known of the harassment and failed to take prompt remedial action because Ramirez did not report any sexual harassment.  However, even though Ramirez did not file a sexual harassment complaint, a Title VII employer has actual knowledge of harassment that is known to "higher management," or to someone who has the power to take action to remedy the problem.  To be considered a manager, a person must have the ability to exert control over employees.  Sharp v. City of Houston, 164 F.3d 923, 929 (5th Cir. 1999)(citing Nash v. Electrospacy Sys., Inc., 9 F.3d 401, 404 (5th Cir. 1993)).  Ramirez stated that Lopez grabbed her, slapped her buttocks and made sexual comments in front of Blanco, the EMS director (Ramirez Aff., D.E. 24, Ex. B, ¶ 12).  Fact issues exist regarding whether the City had actual knowledge of the harassment despite the fact that Ramirez did not file a complaint.  Accordingly, summary judgment should not be entered for defendant.

17

**C.  Retaliation**

A plaintiff must show three things to establish a prima facie case of retaliation: (1) that the employee engaged in an activity protected by Title VII; (2) that an adverse employment action followed; (3) that there was a causal connection between the activity and the adverse action.  Collins v. Baptist Memorial Geriatric Center, 937 F.2d 190, 193 (5th Cir. 1991)(citing Jones v. Flagship International, 793 F.2d 714, 724 (5th Cir. 1987)).  The plaintiff need not establish that her protected activity was the sole factor motivating the adverse action, but must show that "but for" the protected activity she would not have been subjected to the action which she claims.  Id. (citing Jack v. Texaco Research Center, 743 F.2d 1129, 1131 (5th Cir. 1984)).

In order for retaliation to be actionable, it must affect an ultimate employment decision. "Title VII was designed to address ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions."  Dollis v. Rubin, 77 F.3d 777, 781 (5th Cir. 1995).  Ultimate employment decisions include such things as hiring, granting leave, discharging, promoting and compensating."  Id. at 782.  Hostility from fellow employees, verbal threats of being fired, reprimands, a missed pay increase, undesirable work assignments and being placed on "final warning" do not constitute adverse employment actions because of their lack of consequence.  Mattern v. Eastman Kodak Co., 104 F.3d 702, 707-708 (5th Cir. 1997).

Neither plaintiff is claiming that the City actively terminated her employment, but rather that she was constructively discharged.  "Generally speaking, a constructive discharge may be deemed to have resulted when the employer made conditions so intolerable that the employee felt reasonably compelled to resign."  Shawgo v. Spradlin, 701 F.2d 470, 481 (5th Cir. 1983).  A

18

constructive discharge claim requires a greater severity or pervasiveness of harassment than the minimum required to prove a hostile work environment.  Benningfield v. City of Houston, 157 F.3d 369, 378 (5th Cir. 1998).  It is necessary to examine the conditions imposed, not the employer's state of mind, and an employee need not prove that an employer subjectively intended to force the employee to resign.  Bourque v. Powell Elec. Mfg. Co., 617 F.2d 61, 65 (5th Cir. 1980).

> Whether a reasonable employee would feel compelled to resign depends on the facts of each case, but we consider the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; (7) offers of early retirement on terms that would make employee worse off whether the offer was accepted or not.

Barrow v. New Orleans S.S. Ass'n, 10 F.3d 292, 297 (5th Cir. 1994)(citations omitted).

### (1) Wooten

Defendant argues that Wooten was not subjected to any of the Barrow factors and also that the City's prompt remedial measures preclude a claim of constructive discharge.  However, Wooten stated in her affidavit that Blanco told her that if she had not discussed the incident with her co-workers that Lopez would have been terminated, but because she had discussed the matter, she was being punished by having him continue to work for Robstown EMS (Wooten Aff., D.E. 24, Ex. A, ¶ 30).  Such a comment, if true, would amount to badgering, harassment, or humiliation by Blanco calculated to encourage Wooten to resign.

If a jury were to believe Wooten's testimony, it could conclude that she was being retaliated against for reporting the incident to her shift supervisor.  The jury might also conclude that Wooten felt compelled to resign from the City agency when her supervisor refused to

discipline an employee who engaged in sexual assault.  Moreover, despite the fact that Blanco

told Wooten that she and Lopez would not be assigned to work the same shifts, the possibility

existed that employees could trade shifts and they would end up working together (Wakefield

Aff., D.E. 23, Ex. 1, p. 2).  Given those facts, a jury could also conclude that Wooten was afraid

she might have to work with Lopez again, which would make her feel compelled to resign

because she feared for her safety.  For all of these reasons, defendant is not entitled to summary

judgment on Wooten's retaliation claim.

### (2) Ramirez

In response to Ramirez's allegations of retaliation and constructive discharge, defendant

argues that the actions taken against Ramirez prior to her resignation were not ultimate

employment decisions and therefore cannot be considered acts of retaliation and it is correct.

Her complaints that she was isolated and assigned to the Substation are not actionable in a

retaliation claim because hostility from other employees and undesirable work assignments are

not considered ultimate employment decisions for purposes of a Title VII retaliation claim.

Mattern, 104 F.3d 707-708.  See also Fierros v. Texas Department of Health, 274 F.3d 187 (5th

Cir. 2001)(confirming that only ultimate employment decisions can form basis of a retaliation

claim).

Ramirez also alleges that she was constructively discharged after she complained about

Wooten's treatment following her report of the sexual assault.  Defendant asserts that Ramirez

was not subjected to any of the Barrow factors and that her schedule was adjusted so that she

would not have to work with Lopez.  Ramirez testified that she did not work with Lopez from

November 2003 until the end of her employment in February 2004 (Ramirez Depo., D.E. 23, Ex. 2, pp. 174-175).

Ramirez has not described conditions after the first part of November 2003 as being so intolerable that an employee would feel reasonably compelled to resign.  She has not indicated whether the sexual harassment continued and although she said she was scared of Lopez's reaction to her, she has not described any specific information about any interaction they might have had.  Without more, she cannot create a fact issue on whether she was constructively discharged.  Accordingly, it is recommended that summary judgment be entered for defendant on Ramirez's retaliation cause of action.

## RECOMMENDATION

Based on the foregoing, it is respectfully recommended that defendant's motion for partial summary judgment (D.E. 23) be granted in part and denied in part.  Summary judgment in favor of the defendant on plaintiff Ramirez's complaint of retaliation should be entered. Plaintiffs Ramirez and Wooten should be allowed to proceed on their claims for hostile environment sexual harassment and plaintiff Wooten should be allowed to proceed on her retaliation claim.

Respectfully recommended this 27th day of February, 2006.


B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE

21

**NOTICE TO PARTIES**

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **TEN (10) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1)(C) and Article IV, General Order No. 80-5, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within TEN (10) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  Douglass v. United Services Auto Ass'n, 79 F.3d 1415 (5th Cir. 1996)(en banc).